Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2279 | **DATE** | March 15, 2002 |
| **CASE TITLE** | Josephine Walsh v. United Conveyor Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, this Court GRANTS defendant United Conveyor Corporation's motion for summary judgment [34-1]. Any other pending motions are moot and terminated. This action is closed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| ✓ | Notified counsel by telephone. | | 3/22/02 date docketed | 41 |
| X | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| mds(lc) | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPHINE WALSH, | ) |
| Plaintiff, | ) |
| | ) No. 01 C 2279 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| UNITED CONVEYOR CORPORATION, | ) |
| Defendant. | ) |

DOCKETED
MAR 1 8 2002

## MEMORANDUM OPINION AND ORDER

Josephine Walsh ("Walsh") brings a discrimination action under the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, alleging that her former employer, United Conveyor Corporation ("UCC") discriminated against her on the basis of her disability in firing her. Before this Court is defendant UCC's motion for summary judgment. For the reasons stated below, this Court GRANTS UCC's motion for summary judgment.

### I. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Cox v. Acme Health Serv., Inc., 55 F.3d 1304, 1308 (7th Cir. 1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a

verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998).

The movant bears the burden of establishing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); Celotex, 477 U.S. at 324, 106 S. Ct. at 2553. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552-53. The non-movant cannot rest on the pleadings alone, but must designate *specific facts* in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992). The non-movant "'must do more than simply show that there is some metaphysical doubt as to the material fact.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250, 106 S. Ct. at 2511. Weighing evidence, determining credibility, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. Anderson, 477 U.S. at 255, 106 S. Ct. at 2515.

## II. Background

This case arises from events surrounding Walsh's termination from her position as a mail room clerk for UCC's corporate office.[1] UCC is a supplier of ash handling systems for coal burning utility and non-utility generating stations. UCC hired Walsh on March 16, 1987, and she held her position as mail room clerk for the duration of her employment, ending July 6, 1999. As the corporate office's sole mail room clerk in 1999, Walsh was responsible for collecting, sorting, and delivering all incoming mail and facsimiles, metering outgoing mail, maintaining an inventory of mail room supplies, assisting coworkers with mailing issues, and handling DHL, UPS, and Federal Express shipments. Walsh was also one of a team of clerical workers who filled in for the switchboard operator during breaks.

Throughout Walsh's employment, UCC permitted her to take several leaves of absence for medical reasons: (1) in 1997, Walsh took a two-month leave of absence for a hysterectomy, returning to work with a six-week limitation on lifting more than 15 pounds; (2) also in 1997, UCC permitted Walsh to take a six-day leave of absence for another surgery; (3) in 1994, Walsh took a three-week leave of absence; (4) in 1991-92, Walsh took a 12-week leave of absence for foot surgery; and (5) in 1988, Walsh took a two-week leave of absence for back problems. For each of these leaves of absence, UCC held Walsh's job open and returned her to work upon her

---

[1] Unless otherwise indicated by a showing of disagreement, the facts listed below are either undisputed or deemed admitted by Walsh because her Local Rule 56.1 materials either 1) inappropriately denied the material fact by citing to an exhibit that agreed with the Defendants' statement of material facts, or 2) was unsupported by proper citation that specifically referred to the record, affidavits, or other supporting materials relied upon for disagreement, as required by Local Rule 56.1(b)(3)(A) and (B), which this Court strictly enforces.

release to active duty. Until the following sequence of events, Walsh received "adequate" evaluation ratings and her supervisor did not have any serious problems with her.

On February 22, 23, and 24, Walsh called in sick to work. Walsh saw a doctor on February 24 who diagnosed her with influenza. The doctor gave Walsh a note, which she then forwarded to UCC, stating that she needed to be off work "until further notice" due to influenza. UCC permitted Walsh to have the requested time off, designating her initial days off as sick leave, then placing her on short term disability.[2] Walsh remained off work through early March 1999. On or around March 4, 1999, Walsh sent UCC a second doctor's note from her primary physician, Dr. Kale.[3] This note did not contain a diagnosis, but it stated that Walsh should remain off work for the week of March 1st "till further notice." The work restriction emanated from either influenza or back pain. At this time, neither Walsh nor Dr. Kale gave UCC any idea of when Walsh might be well enough to return to work.

On or around March 11, 1999, Walsh sent UCC a third doctor's note from Dr. Kale. The note did not contain a diagnosis. The note stated that on March 15, Walsh could return to light duty work, including no lifting over 15 pounds, no stair climbing, and no pushing or pulling. Dr. Kale placed Walsh on light duty due to back pain. Walsh reported to work on March 15. UCC had held the mail room clerk position open for her, and she returned to work in that position. Although UCC accommodated Walsh's physical restrictions, Walsh did not feel well enough to work a full day. Walsh complained to her supervisor, Bill Anderson ("Anderson"), and Michael

---

[2] When UCC placed her on short term disability, she was given a five-day waiting period before payment commenced under UCC's plan.

[3] When Walsh visited Dr. Kale, she spoke to him about her desire to return to work and asked him what she needed to do in order to get back to work.

-4-

Jacobs ("Jacobs"), Vice President of Administration, that she was feeling weak, that her legs were giving out on her, that she was experiencing pain, that she could not drive herself home, and that she generally "just couldn't function." UCC permitted Walsh to leave early that day. After Walsh left work on March 15, she visited Dr. Kale. Dr. Kale drafted a note, which was sent to UCC, stating that Walsh "needs to be off work until at least March 25, 1999." UCC placed Walsh on a second period of short term disability, which included another five-day waiting period, and UCC continued to hold her job open for her.[4]

On or around April 4, 1999, UCC received another note from Dr. Kale. Because Jacobs could not read the doctor's handwriting, he returned the note and asked the doctor to clarify the diagnosis and the return to work date. Dr. Kale's office returned a legible note stating that Walsh's diagnosis was sciatica and her return to work date was uncertain.

On or around April 15, 1999, UCC received another note from Dr. Kale, which did not contain a diagnosis, but which stated that Walsh was to remain off work "at least until next week." On Monday, April 19, 1999, Jacobs contacted Walsh, who disclosed for the first time that she had been diagnosed with fibromyalgia, which she described as an incurable, chronic condition. Jacobs got Dr. Kale on the line for a three-way conference call. Dr. Kale discussed Walsh's issue as a sleep disorder, and stated that "it didn't seem reasonable to keep Ms. Walsh off work indefinitely because her condition could go on for the next ten years." Dr. Kale suggested to Walsh that she try to return to work.

---

[4] "Holding her job open for her" means that UCC did what was its custom, i.e., it "filled in" for the person on sick leave by employing temporary help, college help, and having others fill in for the person who was on sick leave.

-5-

On April 20, Dr. Kale's office sent UCC another note stating that Walsh could return to work on light duty that same day, and Walsh returned to work as the mail room clerk. Although Walsh worked a full day, she had assistance from Justin Simonitsch[5], a temporary employee in UCC's print room, and Walsh experienced pain, stiffness, headaches, and burning sensations. On April 21, 1999, Walsh again called in sick to work because she "couldn't get out of bed" and her "whole body was in very bad pain." Around this same time, Jacobs spoke to Dr. Kale about Walsh's condition. When Jacobs sought Dr. Kale's advice on handling the situation, Dr. Kale told Jacobs that if her were her employer, "I would fire her."[6]

On or around April 26, 1999, UCC received another doctor's note. This note was the first time that Dr. Kale communicated to UCC his diagnosis of fibromyalgia. Dr. Kale told UCC that Walsh would be on short term disability for a "period unknown."[7] UCC did not receive another doctor's note until June 17, 1999, when it received a note from Dr. Kale stating that Walsh "should continue her disability for another month pending evaluation at that time." At the time Dr. Kale wrote the note, Walsh "wasn't able to function consistently" and was not seeking a release from Dr. Kale to return to work.

---

[5] Walsh asserts that on that day, Justin Simonitsch not only assisted her, but she trained him to perform her position.

[6] After this conversation, Jacobs made a note to follow up with Dr. Kale about what Dr. Kale thought about the "litigation potential" of such an action. In subsequent conversations with Jacobs, however, Dr. Kale admitted that he had "overreacted" in making this statement, and the two men did not have further discussion about terminating Walsh or about litigation potential.

[7] Walsh contends that she always kept UCC informed of her physical condition and told them that she would return "as soon as she was able."

During Walsh's absence, her job duties had been performed by Anderson, some employees in the print department, and two temporary employees hired through a placement firm (both of whom worked no more than a few days.) Although that arrangement solved the problem created by Walsh's absence temporarily, by June, Jacobs had determined that he needed to fill Walsh's position on a permanent basis. In mid-June, Justin Simonitsch, a part-time, temporary employee who had been working in the print room department since January 1999, announced that he was seeking a full-time, permanent position. Simonitsch had assisted Anderson with the mail room clerk duties and he performed well in that position. Accordingly, on or around June 18, 1999, UCC placed Simonitsch in the mail room clerk position on a full time, permanent basis.

Even though it did not know when Walsh would be able to return to work, UCC did not terminate Walsh's employment when it placed Simonitsch as mail room clerk. Rather, UCC continued her leave of absence on the possibility that it would have a position open for her if she returned to work in the future. As of June 18, 1999, UCC already had given Walsh leave in excess of the company policy. UCC's Extended Sick Leave Policy provides that the company would hold an employee's job open for at least 30 days, but after 30 days it would consider each situation on an individual basis. At this point, UCC had held Walsh's job open for nearly four months.

Sometime during the week prior to the July 4th weekend, Walsh contacted UCC about the possibility of returning to work even though she had not provided a doctor's release. On or around July 1, 1999, Walsh spoke with Jacobs directly about possibly returning to work. Jacobs told her that to return to work she would need a doctor's note and that the most important thing

was for her to try to return to work; he told her that they "would work something out." When she spoke to Jacobs, Walsh did not have a release from her doctor, she had not spoken yet to her doctor about returning to work, and she did not know if she would be able to return to work.

After UCC closed for the holiday weekend, Walsh left Jacobs a voice mail stating that she would return to work on July 6; that she would fax him a doctor's release to return to work over the weekend; and that she needed four days off in her first eight days back to work.[8] On Saturday, July 3, Walsh faxed to UCC a release to return to work, which was dated July 1, 1999. The release stated that Walsh had "sufficiently recovered to resume work on July 6, 1999," and that her only restrictions were no lifting over 30 pounds, and no strenuous repetitive motion that would cause muscle strain. Walsh agreed that these restrictions accurately reflected her limitations at that time, but she also required accommodation from UCC in the form of time off to attend therapy appointments.

Walsh appeared for work on July 6, the first scheduled work day after the long weekend. Despite his scheduled vacation, Jacobs also reported to work that day. Jacobs, who had not picked up his voice mail over the weekend, learned for the first time that Walsh had been released for, and had reported to, work. Because UCC had filled the mail room clerk position formerly held by Walsh,[9] it no longer had a position in which to place her. Jacobs reviewed the open positions at the Company with both Laura Morand, his secretary, and Anderson. They

---

[8] Walsh denies that she stated she would need four days off in her first eight days of work. Her deposition, however, clearly shows that she "left [in the voice mail message] the dates of the days that I needed to finish the therapy and doctor's appointment . . . ."

[9] Walsh claims she had no idea that someone had filled her position. UCC, however, asserts that Robin Dixon, another employee, had told Walsh that UCC had filled the mail room clerk position.

-8-

determined that Walsh did not have the qualifications to perform any open positions; therefore, they informed her on July 6, 1999 that they were terminating her employment.[10]

On November 1, 1999, Walsh became employed by ESAB as a customer representative. Walsh did not have any restrictions on her activities; she did not request or require any accommodation from ESAB; and she did not have any attendance issues. Walsh resigned from ESAB voluntarily to take a full-time job as a customer service representative with Sanofi Synthelabo, the pharmaceutical company, which she began on April 10, 2000. During her current employment at Sanofi, Walsh has not taken any leave of absence, she has not had any issues with tardiness or absenteeism, nor has she requested any accommodation for her alleged condition.

UCC has not returned any employee to his or her job after an indefinite leave of absence. Within the past six years, UCC has returned only one employee to her former position after a leave of absence longer than four months.[11] Specifically, UCC allowed Joann Rieckman, who held a drafter position, to take an approximately five-month maternity leave when she had twins.

---

[10] Walsh claims that at this meeting, she was given a packet of information that stated she was not eligible for rehire and that they would not give her letters of recommendation. She further claims that when she asked whether there ever would be any positions open for her and whether she could reapply, they answered in the negative. UCC denies they ever told her she was ineligible for rehire or that they gave her a packet of information that stated that (they did, however, check the "no rehire" box on the Employee Change Notice form). They further respond that while UCC does not give letters of recommendation, they respond to reference inquiries providing the employee completes an employee authorization form; Walsh did, and Jacobs responded to inquiries from both of Walsh's subsequent employers.

[11] The parties list the leave history of 17 other employees at UCC. The leaves ranged anywhere from under two weeks to approximately six months. Of those 17, the two employees who took leaves of absence of approximately six months were terminated as a result.

Rieckman obtained this time by taking a six-week paid maternity leave pursuant to UCC's maternity leave policy, then taking a twelve-week unpaid leave under the Family and Medical Leave Act. Rieckman's leave was for a finite (approximately five-months) period of time and she gave a definite return to work date. Also within at least the past six years, UCC has not displaced, terminated, or bumped an employee hired on a permanent, full-time basis, to reinstate another employee returning from a leave of absence.

### III. Discussion

The ADA requires covered entities, including private employers, to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would cause an undue hardship." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 122 S. Ct. 681, 689 (2002) (citing 42 U.S.C. §12112(b)(5)(A)). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. (citations omitted). Thus, in order to make a claim under the ADA, Walsh must demonstrate that she is a disabled person as defined by the statute, that the employer knew of the disability, and that she is otherwise qualified to perform the essential functions of the job sought, with or without reasonable accommodation. Winfrey v. City of Chicago, 259 F.3d 610, 614 (7th Cir. 2001). For the purposes of this motion for summary judgment, the parties do not dispute that Walsh had a disability or that UCC knew about it. Rather, UCC contends that because Walsh remained out of work almost continuously from February 22, 1999, to the time UCC replaced her on or around June 18, 1999, Walsh was not

otherwise qualified to perform the essential functions of her job as the mail room clerk with or without reasonable accommodation.

Thus, the critical inquiry here is whether an "essential function" function of Walsh's job as mail room clerk for UCC was regular attendance, and if so, did she fulfill that "essential function." While the Seventh Circuit has held that regular attendance is not an essential function of every job, "regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job." Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co., 201 F.3d 894, 899-900 (7th Cir. 2000). In fact, "[e]xcept in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform any of his job functions, essential or otherwise.'" EEOC v. Yellow Freight Sys. Inc., 253 F.3d 943, 948 (7th Cir. 2001) (citations omitted) (also collecting cases in which this proposition is upheld).

In Waggoner v. Olin, 160 F.3d 481 (7th Cir. 1999), the Seventh Circuit upheld summary judgment for an employer that terminated an employee who had two leaves of absence, one for fourteen days and one for five months. The court accepted the employer's "common sense" argument that "if one is not able to be at work, one cannot be a qualified individual." Id. at 482. The court went on to explain:

It is as if [the plaintiff] thinks that rather than ensuring that she be allowed to work, the ADA requires Olin to provide her with a job but not require that she regularly perform it. Rather, Olin must hire another employee to do the job for her while she remains a full-time employee. The Act does not go so far."

Id. at 484.